IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.C., *a minor*, and K.J., *a minor*, by Claire Leotta, Esq., *Guardian Ad Litem*, Plaintiffs, | : | CIVIL ACTION |
| v. | : | |
| APEX HUMAN SERVICES, LLC, et al., Defendants. | : | No. 23-cv-4631 |

**MEMORANDUM OPINION**

**CRAIG M. STRAW**
**UNITED STATES MAGISTRATE JUDGE** **September 25, 2026**

Plaintiffs A.C. and K.J., both minors, bring this suit through their guardian *ad litem*, Claire Leotta, Esq., against Defendants Apex Human Services, LLC (hereinafter "Apex"), Epic Health Services (PA), LLC (hereinafter "Epic"), and their former employee, Christina Good (hereinafter "Good"). Plaintiffs assert claims of negligence and vicarious liability stemming from Good's employment as a home health aide, during which she provided care for S.J., a minor and sibling of A.C. and K.J., and based on the sexual abuse Plaintiffs suffered while at Good's home in Delaware.

Plaintiffs and Defendant Epic filed cross-motions for summary judgment on the issue of liability under Federal Rule of Civil Procedure 56. Docs. 59, 62; Fed. R. Civ. P. 56(a). The Court granted Defendant Apex's request to join Epic's motion. (Doc. 91.) For the reasons that follow, Epic and Apex's motion is **GRANTED**, and Plaintiffs' motion is **DENIED**.

## I. FACTUAL BACKGROUND

Epic and Apex are health companies providing home care services for special needs children and adults. Doc. 61-3, at 16:2-7; Doc. 61-5, at 20:8-21. As part of their services, Epic and Apex hire, train, and employ home health aides who provide care for patients. Id. Home health aides are trained employees qualified to provide unskilled services. Doc. 61-3, at 18:2-9; Doc. 61-5, at 21:4-23. These unskilled services involve assisting clientele with daily living necessities such as bathing, grooming, and meal preparation, all of which occur within patients' own homes. Doc. 61-3, at 18:5-12; Doc. 61-5, at 20:22-25.

K.C.J. is the mother of three daughters: A.C., K.J., and S.J. Doc. 27, at ¶ 14. S.J. is a minor child who suffers from severe cerebral palsy and requires specialized care. Doc. 62, at ¶ 3. Prior to Good's employment with Epic and Apex, Good and K.C.J. developed a personal friendship. Doc. 61-2, at 11:1-17; Doc. 61-6, at 32:16-34:20. In 2018 K.C.J. required assistance caring for S.J. Doc. 61-6, at 35:3-13. Good learned K.C.J. needed this assistance through their personal relationship.[1] Doc. 61-2, at 11:1-5. Good applied to Epic to work as a home health aide specifically to care for S.J. Doc. 61-6, at 34:14-17; Doc. 61-2, at 11:1-5.

Epic began the hiring process for Good in September 2018. Doc. 62, at ¶ 5. As part of this process Good underwent clearance and training procedures. This included a Pennsylvania State Background Check, a fingerprint-based record check through the Pennsylvania Department of Human Services, and a Pennsylvania Child Abuse History Certification, all of which found no record of criminal history. Id. at ¶¶ 6-8. Good's training included fifty-nine hours of classroom

[1] K.C.J. described Good as a friend. Doc. 61-6, at 33:20-21. K.C.J., Good, and their respective spouses socialized outside of Good's time serving as an aide for S.J., including group vacations to K.C.J.'s family beach house. Doc. 61-2, at 12:9-14. Ultimately, K.C.J. stated that Good "worked for me and my kids." Doc. 61-6, at 33:17-19.

instruction followed by sixteen hours of "hands-on care" in order to receive certification as a home health aide. Doc. 61-3, at 67:24-68:6. Good was also required to attend an orientation training seminar, covering Epic's corporate policies and procedures. Id. at 24:9-18.

During the orientation training seminar that Good attended, Epic's "professional conduct policy" was reviewed with trainees. Id. 76:10-22. This document contained Epic's corporate policies and procedures for newly hired home health aides. Id. 45:4-14. Epic's written corporate policies and procedures prohibited home health aides from (1) caring for a child other than their assigned client, including friends of the client, classmates, siblings, or other relatives under the age of 18, and (2) taking a client to an aide's own home. Id. at 30:16-31:5; 45:4-14. These policies were reiterated during Epic employee training, including orientation and annual in-service training. Id. at 31:8-17; 45:4-14.

On October 12, 2018, Epic authorized Good to provide home health services for S.J. Doc. 61, at ¶ 12. Good was instructed to follow S.J.'s physician-created care plan. Id. at ¶ 14. This care plan required Good to assist S.J. with "oral care, dressing, skin care, diaper changes, assistance with walking and ambulation, preparation of meals, and feeding." Doc. 62-11, at 1-2. Notably, the care plan did not contain any services which needed S.J. to leave K.C.J.'s home. Doc. 61, at ¶ 15. Nor did the care plan contain any care instructions for any children other than S.J. Id. at ¶ 16.

Epic supervised Good during her care of S.J. First, Epic required home health aides to document the care they provided to their patients daily. Doc. 61-3, at 50:14-20. Therefore, Good was required to document the care she provided to S.J. Id. at 50:8-20. Epic policy required Good to complete this documentation every day Good cared for S.J. Id. Good's clinical supervisor reviewed this documentation. Id. 50:12-13. Epic also conducted weekly "customer service" calls

during which Epic employees called the patient's family members directly to ensure Epic's home health aides were providing adequate care. Id. at 51:1-21. Finally, supervisor visits occurred at patient homes while aides were providing care. Id. at 53:6-16. These supervisor visits occurred both on a scheduled basis and, more rarely, unannounced. Id. at 53:17-20. Eventually during Good's employment with Epic as a health aide for S.J., Good began babysitting K.J. at K.C.J.'s request. Doc. 62, at ¶ 24. K.C.J. paid Good to feed, change, dress and bathe K.J. Doc. 61-6, 60:12-61:5.[2]

On May 4, 2020, Good voluntarily ended her employment with Epic and began working for Apex. Doc. 62, at ¶ 19. The next day, May 5, 2020, Good began working for Apex as a home health aide providing care for S.J. Id. at ¶¶ 20, 22. Good underwent clearance and training as part of Apex's hiring process. Doc. 62-6, at APEX0008-0040. This training included an orientation process where home health aides received training in "field employee conduct standards" which RN supervisors and/or human resources personnel provided. Doc. 61-5. at 31:10-20. Mohammed Sesay, the Apex CEO and Owner, led Good's orientation. Id. at 41:24-25. During this orientation, Apex's home health aides were instructed on Apex policy, including prohibiting (1) caring for a child other than their assigned client, including other relatives under the age of 18, and (2) taking a client to an aides' own home. Id. at 42:7-47:1-14. These policies were reiterated to Apex home health aides in additional training, including refresher trainings and site visits. Id. at 47:10-14.

While employed by Apex, Good provided care to S.J. according to a care plan which S.J.'s physician approved. Doc. 61-5, at 111:7-112:9. S.J.'s care plan authorized Good to provide

[2] The parties dispute whether or not K.C.J. paid Good to care for K.J. Good testified that she was *not* paid by K.C.J. to care for K.J. Doc. 61-21, 4:10-12; 82:22-25. K.C.J., however, testified that she paid Good to watch K.J. Doc. 61-6, at 22:8-23:13.

"full assistance to S.J. with activities of daily living, bathing, eating, grooming, transferring, and diaper changes." Doc. 74-2, at 2-3. Good was also authorized to help S.J. with walking, ambulation, and bathing S.J. as scheduled by K.C.J. Id. The Apex care plan did not contain any services requiring S.J. to leave K.C.J.'s home. Id. Nor did the Apex care plan contain any care instructions for any children other than S.J. Id.

Apex supervised Good while she provided care to S.J. under Apex's employment. Good was required to document the care she provided to S.J. Doc. 61-5, at 118:6-17. Apex supervisors reviewed this care documentation every two weeks during mandatory physical office check-ins which Good attended. Id. Apex supervisors conducted supervisory visits every thirty days in addition to a sixty day "summary of condition" supervisory visits. Id. Finally, Mr. Sesay would speak to K.C.J. every month regarding the care Good provided to S.J. Id. at 136:18-137:7.

At some point during Good's employment with either Epic or Apex, Good began taking S.J., K.J. and A.C. to Good's home in Wilmington, Delaware, with K.C.J.'s permission. Doc. 62, at ¶ 27.[3] Good transported the children to her Delaware home "once or twice a week" so that Good could simultaneously care for the children and complete household activities such as cooking dinner for Good's family. Doc. 61-2, at 15:11-14. From 2019 through most of 2021, Good lived at her Delaware home with her husband, her daughter Jessica Good (hereinafter "Jessica"), Jessica's children, and Jessica's then-boyfriend, Joseph Rosario (hereinafter "Rosario"). Doc. 61-2, at 7:19-8:17; Doc. 27, at ¶ 16.

---

[3] The parties dispute exactly when Good began caring for K.J. outside of K.C.J.'s home. Plaintiffs claim Good began babysitting K.J. in Good's personal residence "six months after [she] began working for Epic." Doc. 61-6, at 47:8-48:6. Epic alleges Good began babysitting K.J. after COVID-19 lockdown restrictions were lifted in approximately 2021, *after* Good ended her employment with Epic. Doc. 62, at ¶ 26. In any event, resolving this fact in the light most favorable to Plaintiffs does not change the analysis. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-26 (1986).

On September 21, 2021, Good transported K.J., A.C. and S.J. to Good's residence in Wilmington, Delaware, for a play date.[4] Doc. 62, at ¶ 27. Once they arrived, Good left A.C. and S.J. in the care of Jessica and Rosario, and Good departed the home to transport S.J. to a medical appointment at Nemour's Children's Hospital. Id. at ¶ 29. After Good left, Jessica also left the home to transport her nephew to sports practice. Doc. 61-7, at 36:4-13; Doc. 61-11, at 4. Rosario, who remained at the home, then attempted to sexually assault A.C. Doc. 62, at ¶ 30. When Jessica returned to the home, A.C. reported Rosario's actions to Jessica. Doc. 61-2, at 28:23-30:3. Good then immediately transported A.C., K.J., and S.J. back to their home in Pennsylvania. Id. at 34:1-8. A.C. informed K.C.J. about Rosario's attempt, and K.J. informed the police. Doc. 61, at ¶ 22. A police investigation began and discovered that Rosario was sexually abusing K.J. in Good's home between March 2020 and September 21, 2021. Doc. 61-11, at 4-5; Doc. 62-2, at 9:10-18. Rosario's only confirmed sexual assault of A.C. occurred during the September 21, 2021, incident. Doc. 62, at ¶ 31. In May 2022, Rosario pled guilty to one count of rape in the third degree. Doc. 62-2.

Epic and Apex were seemingly unaware of Good and K.C.J.'s babysitting arrangement with Good. Epic corporate staff was unaware of the arrangement. Doc. 61-3, at 56:3-20. Good's direct clinical supervisor at Epic, who also managed S.J.'s case more broadly, had no recollection of any such arrangement. Id. 16:22-17:1-22. Likewise, Apex corporate staff was unaware of the arrangement between Good and K.C.J. Doc. 61-5, at 95:4-23; 105:5-12; 139:19-

[4] There is conflicting testimony as to who transported K.J., A.C. and S.J. to Good's home that day. Good testified that she drove the children to her home in Delaware. Doc. 61-2, 27:24-28:1. Good's daughter, Jessica, testified that she drove the children to Good's home. Doc. 61-7, at 35:7-18. Viewing this dispute in the light most favorable to the Plaintiffs, this Court accepts that Good, not Jessica, took the children to her home on this day. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-26 (1986).

23. Good herself testified that she never disclosed the arrangement to either Epic or Apex supervisors. Doc. 61-2, at 14:13-19; 46:3-11. K.C.J. is the only person who testified that Epic and Apex both knew about the babysitting arrangement. Doc. 61-6, at 21:23-23:1; 55:16-56:22.[5] Good's employment with Apex ended in September 2021 after the September 21, 2021, incident. Doc. 61-5, at 23:4-6.

## II. PROCEDURAL HISTORY

On November 22, 2023, Plaintiff K.C.J., on behalf of A.C. and K.J., filed her original complaint against Apex alleging one count of negligence, gross negligence, and recklessness. Doc. 1. On March 14, 2024, the parties consented to magistrate jurisdiction, and the instant matter was referred to this Court. Doc. 9. On April 12, 2024, Plaintiffs amended their complaint, adding Good and Aevanna Healthcare, LLC,[6] as defendants. Doc. 13. Plaintiffs subsequently determined that Aevanna Healthcare, LLC, was Good's employer in 2018. Doc. 25 at 2. On August 6, 2024, Plaintiffs amended their complaint again, removing Aevanna and instead naming Epic as a defendant in this case. Doc. 27.

The operative complaint alleges one count of negligence, gross negligence, and recklessness against all three Defendants. Doc. 27. Plaintiffs allege that Defendants were negligent, careless, grossly negligent, and/or reckless as follows:

> a. By Defendant(s) and/or Defendant(s)' agent(s) leaving children unsupervised while in Defendant(s) and/or Defendant(s)' agent(s)'s care;
> b. By failing to establish adequate child abuse prevention policies, procedures, and practices;

---

[5] Of note, K.C.J. was unable to identify (1) which Epic and Apex supervisors she specifically discussed this arrangement with, (2) on what dates she discussed this arrangement with Epic and Apex supervisors and, (3) what exactly was said during these discussions. Doc. 61-6, at 21:23-23:1; 55:16-56:22.

[6] Aevanna Healthcare, LLC, employed Good during 2018 outside of the relevant time period for this matter.

c. By failing to make mandatory and adhere (and ensure adherence) to such policies, procedures, and practices;
d. By failing to adequately screen and supervise all those with access to children, including [Rosario];
e. By failing to retain, hire, train, and supervise agents/employees with regard to the prevention of child sexual abuse;
f. By failing to adequately monitor and supervise [Rosario] and Plaintiffs;
g. By failing to know the risks of sexual abuse inherent in youth serving activities;
h. By failing to require child sex abuse training for parents/guardians and children;
i. By failing to recognize the signs that [Rosario] was a child sexual predator;
j. By failing to conduct a background check on [Rosario];
k. By allowing [Rosario] to be alone with children despite his history, which was known or should have been known;
l. By failing to report [Rosario] to the appropriate authorities; and,
m. By violating the duties imposed upon them pursuant to the Restatement of Torts, Second, §§ 314A, 315, 317, 323, 324A, 343, 344, & 371, as adopted in Pennsylvania.

Doc. 27, at ¶ 42.

On August 6, 2024, Apex filed its answer to Plaintiffs' second amended complaint, added a cross-claim against Epic and Good, and sought contribution from both co-defendants. Doc. 28. Epic filed its answer to Plaintiffs' second amended complaint on September 3, 2024. Doc. 29. To date, Good has not filed an answer to Plaintiffs' second amended complaint or filed any other responsive pleading.

On October 20, 2025, Plaintiffs and Epic filed cross-motions for summary judgment. Docs. 59, 60, 61, 62 and 63. Apex moved to join Epic's motion for summary judgment on November 19, 2025. Doc. 68. This Court granted Apex's motion to join the motion on September 24, 2024.[7] Doc. 91. On November 19, 2025, Plaintiffs A.C. and K.J, moved to

[7] As part of this joinder motion, Defendant Apex asks to "adopt[] and incorporates by reference the . . . Legal Arguments set forth in Section IV(1)(a) and (b) filed in support thereof and pertaining to there being no legal duty to protect non-patients from criminal acts of third parties." Doc. 68.

appoint Claire Leotta, Esq., as guardian *ad litem*. Doc. 65. The Court granted this motion on January 23, 2026. Doc. 85.

## III. LEGAL STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that could affect the outcome of the proceeding." Roth v. Norfalco LLC, 651 F.3d 367, 373 (3d Cir. 2011) (internal quotation marks and citation omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986)). Thus, "by its very terms, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson 477 U.S. at 247-48 (1986).

"The non-moving party may not merely deny the allegations in the moving party's pleadings; instead, they must show where in the record there exists a genuine dispute over a material fact." Id. (citation omitted). A mere scintilla of evidence supporting the nonmoving party will not suffice for a court to deny summary judgment. Id. at 252. Rather, the nonmovant must "set forth specific facts showing there is a genuine issue for trial." Id. at 256. Furthermore, a moving party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex, 477 U.S. at 323.

## IV. DISCUSSION

Under Pennsylvania law, to set forth a prima facie case for negligence, gross negligence, or recklessness, the plaintiff must establish: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." Toro v. Fitness Int'l LLC., 150 A.3d 968, 976-977 (Pa. Super. Ct. 2016).[8]

"The initial element in any negligence cause of action is the first: that the defendant owes a duty of care to the plaintiff." R.W. v. Manzek, 888 A.2d 740, 746 (Pa. 2005) (first citing Althaus v. Cohen, 756 A.2d 1166, 1168 (2000); then citing Gibbs v. Ernst, 647 A.2d 882, 890 (1994)). A duty consists "of one party's obligation to conform to a particular standard of care for the protection of another." Id. (citing Atcovitz v. Gulphs Mills Tennis Club, Inc., 812 A.2d 1218, 1222 (Pa. 2002)). There is no duty, however, to control the conduct of a third party to protect another from harm, except where the defendant stands in some special relationship with either: (1) the person whose conduct needs to be controlled; or (2) the intended victim of the conduct, giving the intended victim a right to protection. Emerich v. Phila. Ctr. Hum. Dev., 720 A.2d 1032, 1036 (Pa. 1988).

[8] Pennsylvania courts treat negligence, gross negligence, and recklessness as a single cause of action, differentiated only by the degree of departure from the standard of care. Kevin C. v. Founds. Behav. Health, 705 F. Supp. 3d 368, 379 (E.D. Pa. 2023) (citing Feleccia v. Lackawanna Coll., 215 A.3d 3, 19 (Pa. 2019)); see also Monroe v. CBH20, LP, 286 A.3d 785, 700 (Pa. Super. Ct. 2022) ("[G]ross negligence and recklessness are states of mind; they are forms of negligence, not independent causes of action."). To establish gross negligence, the plaintiff must show the breach to be a "flagrant, gross[] deviat[ion] from the ordinary standard of care." Albright v. Abington Mem'l Hosp., 696 A.2d 1159, 1164 (Pa. 1997) (citation omitted). Similarly, to establish recklessness, the plaintiff must show the defendant breached their duty of care by engaging in "wanton and willful misconduct." Archibald v. Kemble, 971 A.2d 513, 519 (Pa. Super. Ct. 2009).

**A. Defendants are not vicariously liable for the actions of Defendant Good.**

The initial question in this case is whether Epic and Apex are vicariously liable for Rosario's actions against the Plaintiffs based on Good's babysitting arrangement with K.C.J. and subsequent transportation and care of Plaintiffs outside of K.C.J.'s home. Plaintiffs' claims of vicarious liability against Epic and Apex can only survive summary judgment if Good's care of K.C.J.'s children *other* than S.J., and her transportation of said children *outside* K.C.J.'s home, occurred during the course of Good's employment with Epic and Apex. Because Good's actions occurred outside the scope of her employment, Plaintiffs' claims of vicarious liability against Epic and Apex fail as a matter of law.

Plaintiffs argue they are entitled to summary judgment on their negligence claims because Defendants Epic and Apex are vicariously liable for Good's actions. Doc. 60, at 5-12. According to Plaintiffs, "[h]ere, the facts are not in dispute that Christina Good was acting within the scope of her employment when she brought A.C. and K.J. to her home in Delaware where they were abused by Joseph Rosario." Id. at 4. Conversely, Epic and Apex argue that, as a matter of law, they did not have a duty to protect A.C. and K.J. because Good's babysitting and transportation of A.C. and K.J. was outside the scope of Good's contracted employment as a home health aide for S.J. Doc. 62, at 8-11.

To prove negligence, a plaintiff must proceed against a defendant through either a theory of direct liability or vicarious liability. See Scampone v. Highland Park Care Ctr., 57 A.3d 582, 597 (Pa. 2012). When a plaintiff seeks to hold a defendant responsible for the negligence of another actor "by reason of some relation existing between [the actor] and [the defendant]," that is a claim of vicarious liability. See Crowell v. City of Phila., 613 A.2d 1178, 1181 (Pa. 1992).

A defendant may be found vicariously liable for the negligence of another actor if an employer-employee relationship exists between the defendant and the actor. See Fitzgerald v. McCutcheon, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979). An employer can be held vicariously liable for the negligent acts of his employee that cause harm to a third party, if such acts were committed during the course of and within the scope of the employment. Fitzgerald, 410 A.2d at 1271 (Pa. Super. Ct. 1979). Conduct is "within the scope of employment" when:

> (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.

Costa v. Roxborough Mem'l Hosp., 708 A.2d 490, 493 (Pa. Super. Ct. 1998) (citing Fitzgerald, 410 A.2d at 1272).

Alternatively, "[c]onduct of an [employee] is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the [employer]." Justice v. Lombardo, 208 A.3d 1057, 1067 (Pa. 2019). "Generally, the scope of a[n] [employee's] employment is a fact question for the jury." Ferrell v. Martin, 419 A.2d 152, 155 (Pa. Super. Ct. 1980) (citing Anzenberger v. Nickols, 198 A.2d 309 (1964)). "Where the facts are not disputed, however, the question of whether or not the [employee] is within the scope of his or her employment is for the court." Id. (citing Vadyak v. Lehigh & New England R. R., 318 Pa. 580 (1935)).

It is undisputed that Epic and Apex employed Good between 2018 and 2021. Plaintiff's allegations against Epic and Apex, however, stem from Good transporting A.C. and K.J. outside of K.C.J.'s home, and babysitting A.C. and K.J. in Good's own home in September

of 2021. See Doc. 27, at ¶ 42. For the reasons below, no reasonable jury could conclude that this conduct was within the scope of Good's employment as a home health aide.[9]

First, Good's actions were not the kind and/or nature of her employment with Epic and Apex. Epic and Apex authorized Good to provide home health services only for S.J. pursuant to explicit care instructions of physician-approved care plans. These care plans did not contain any services which needed S.J. to leave K.C.J.'s home. Doc. 61, 15 ¶ 15; Doc. 74-2, at 2-3. Nor did the care plans contain any care instructions for any children other than S.J. Id. Finally, not only did Epic and Apex corporate policies explicitly prohibit these actions, Good was trained and notified of these prohibitions during her employment with both companies.[10]

Since Good's employment with Epic and Apex did not authorize or require Good to provide care for children other than S.J., transport any children, including S.J., outside of K.C.J.'s home and leave any children, including S.J., in the care of third parties Epic and Apex

[9] It is also undisputed that Rosario, a third party, and not Good, intentionally used force against Plaintiffs. As such, the Court need not analyze Plaintiffs' claim for vicarious liability under the fourth prong set forth in Costa and its progeny. The first three prongs suffice. 708 A.2d at 493.

[10] Plaintiff's contention that "[c]aring for K.J. and A.C. was incidental to providing home health care services to S.J." lacks merit. Doc. 60 at 5. Epic and Apex are health care provider companies, not professional babysitting companies. Both companies had explicit policies and trainings against both babysitting non-patients and transporting *any* persons outside of the patient's home. Moreover, both companies established physician-approved care plans with explicit care instructions and parameters for home health aides to follow. It is true that "[a]n act may be within the scope of employment even where the employer has expressly forbidden the conduct." Aliota v. Graham, 984 F.2d 1350, 1358 (3d. Cir. 1993) (citing Restatement (Second) of Agency § 230 (Am. L. Inst. 1958)). Even in such instances, however, the act in question must have been motivated, at least in part, to serve the employer's purposes. See Aliota, 984 F.2d 1359. Good stated that she babysat K.J. to help "[her] employer, [K.C.J.], out that, you know, to help her out." Doc. 61-2, 18:11-19. Even viewed in the light most favorable to Plaintiffs, this statement does not support Plaintiffs' contention that the babysitting (or transportation) of K.J. was motivated to help Epic or Apex. If anything, this statement indicates that Good considered K.C.J. an additional employer, separate and apart from Epic and Apex. Notably, Plaintiffs functionally concede this point. See Doc. 60, at 9 ("Whether Good was correct to believe that K.C.J., and not Epic or Apex, was her employer is irrelevant . . .")

did not employ, it is not reasonable to conclude that Good or Rosario's actions were anticipated or expected by Epic and Apex. See e.g. R.A. ex rel N.A. v. First Church of Christ, 748 A.2d 692, 700 (Pa. Super. Ct. 2000) (finding that co-defendant minister's behavior involving the sexual abuse of a minor, occuring outside of the minister's place of employment and not for the purposes of serving the child as a spiritual advisor, was not the kind and nature of his employment, could not be anticipated by defendant church, and was outside the scope of employment); see also Costa v. Roxborough Mem'l Hosp., 708 A.2d 490, 494 (Pa. Super. Ct. 1998) (holding that defendant hospital was not vicariously liable for assault by employee hospital worker against the plaintiff security guard because the assault was not remotely related to the kind and nature of employment the hospital worker was employed to perform).[11] Thus, the first element for vicarious liability is not met.

Second, Good's actions occurred outside the authorized time and space limits of her employment as a home health aide with Epic and Apex. Defendants argue, "Good was not within the time limits of Epic's employment when taking the children to her private home because it was unknown to Epic and she was not being paid for that prohibited act. K.C.J. admits that she paid Good for babysitting K.J., and she was the one who engaged Good to provide that benefit to K.C.J. When babysitting, for K.J. and A.C., Good was K.C.J.'s employee and acting with K.C.J.'s permission and under her direction." Doc. 73, at 9.[12] Plaintiffs and Defendants both cite

[11] Plaintiffs have not presented any evidence to show how Good cared for A.C., and how that care was within the scope and nature of Good's employment with Epic and Apex. Accordingly, no reasonable juror could conclude A.C.'s care was of the same kind and nature as S.J.'s care required under Good's employment. See Celotex Corp., 477 U.S. at 322.

[12] Even assuming that Good did not view K.C.J. as her employer, record evidence that Good took K.J. and S.J. to Good's home for weekends and overnight, and that Jessica Good would transport the children to Good's home for "playdates" with Jessica's children, establishes this activity

R.A. ex rel N.A. v. First Church of Christ, which is instructive on this issue. 748 A.2d 692 (Pa. Super. Ct. 2000). In First Church of Christ, the Superior Court of Pennsylvania held that the defendant church ("First Church") was not vicariously liable for sexual abuse committed by its employed minister against a minor victim. Id. at 700. The Superior Court's simple analysis stated that because none of the abuse occurred at the minister's place of employment (the church) it was not within the time and space limits of his employment with First Church.[13] Id. at 700.

The analysis in the instant matter is much the same and, this Court reaches the same conclusion as First Church. Id. at 699. Epic and Apex only authorized Good to work as a home health aide for S.J. in S.J.'s own home. Doc. 62, at 13; Doc. 74-2, at 2-3. Both companies explicitly forbade their home health aides from taking clients outside of client homes. Doc. 61-3, :45:4-14; Doc. 61-5, 42:7-47:14. The companies also trained home health aides, including Good, on these policies. Doc. 61-3, 45:4-14; Doc. 61-5, 47:10-14. Clearly, Good's home was not an authorized location within the scope of her employment. Plaintiffs present no evidence to dispute these facts. Accordingly, no reasonable juror could find that Epic and Apex authorized Good to work as a home health aide in her own home for S.J., let alone S.J.'s siblings, one of whom was the target of Rosario's abuse. See Celotex Corp., 477 U.S. at 322.

---

occurred outside the authorized time and space limits of Good's employment with Epic and Apex. Doc. 61-6, 50:24-51:6; Doc. 61-7, 36:14-25.

[13] The Superior Court determined that First Church was not liable under a claim of negligent hiring, supervision and retention of the minister. First Church of Christ, 748 A.2d at 698-699. The Superior Court recited several reasons why the minister's home did not constitute "Church premises" despite the housing allowance and expenses First Church paid to the minister, and occasional private prayer meetings and bible studies held at the minister's home. Id. at 699. First Church is instructive regarding what expected control employers can and cannot have over employees in their own homes. There is no record evidence in this case establishing that either Good's home constituted Epic and Apex work property, or that Epic and Apex had any ability to control Good's actions, or the actions of others, within Good's own residence.

Third, and finally, Good's actions were not actuated to serve Epic and Apex. Thus, neither Epic nor Apex are vicariously liable for Good's conduct. Plaintiffs argue "Good's actions were clearly actuated, at least in part, by a purpose to serve Epic and Apex." Doc. 60, at 8. They submit two evidentiary examples: (1) that "Good testified that whenever she was providing home health aide services to S.J., she was also babysitting K.J. and that she never clocked out when she brought the girls to Delaware because she 'was still working,'" and (2) that Good testified she was unaware that babysitting while providing home health aide services was against Epic and Apex policies. Id. at 8. This small amount of evidence in the record is insufficient to establish Good's actions were actuated, even in part, to serve Epic and Apex.

Employee conduct that is actuated to serve an employer must occur in furtherance of the employee's employment. See Costa 708 A.2d at 495 (finding that hospital employee's assault of plaintiff security guard during requested drug test of employee was not in furtherance of employee's employment but, rather, in retaliation against employee's employment). Pennsylvania law, furthermore, largely considers instances where an employee assaults a third party, including the plaintiff, as *not* in furtherance of their employment. See e.g., D.F. v. DNC Servs. Corp., CIVIL ACTION NO. 25-5003, 2025 WL 3217750, at *5 (E.D. Pa. Nov. 18, 2025) (finding that employee's sexual abuse of minor plaintiff was not actuated by any purpose in serving his employer); see also Burdyn v. Old Forge Borough, 3:12-CV-2236, 2016 WL 5844863, at *6 (M.D. Pa. Oct. 3, 2016) (adopting Magistrate Judge Report and Recommendation finding that sexual abuse perpetrated by two employees against plaintiff was purely motivated by personal reasons and not in furtherance of the employer's interests); Doe 6 v. Pennsylvania State Univ., 982 F. Supp. 2d 437, 445 (E.D. Pa. 2013) (finding that employee assistant football coach's sexual molestation of plaintiff was not actuated to serve employer university, but rather

for the employee's own personal reasons and deviant gratification) Doe v. Liberatore, 478 F. Supp. 2d 742, at 758 (M.D. Pa. 2007) (finding that acts of sexual abuse perpetrated by employee priest against plaintiff were not actuated by any purpose of serving employer Diocese, church or individual bishop); First Church of Christ, 748 A.2d at 700 (finding that employee minister's sexual abuse of minor plaintiff was not actuated by any purpose of serving employer church); Costa, 708 A.2d at 495 ("Here, however, it is clear that although the Hospital staff requested that [the employee] submit to a drug test pursuant to their policy, [employer's] evidence suggest that [employee's] subsequent assault was not committed in furtherance of his employment, but, rather in retaliation against Hospital policy, and in anger arising from his belief that [hospital] was 'out to get him.'"). No authority exists, nor has Plaintiff presented any authority, finding an employer liable for the assault of a non-employee. The facts presented here are considerably more attenuated than these cases, as Defendants did not even employ Rosario.

Courts have found vicarious liability based upon employee assaults, but they are rare. See generally Barry ex rel. Cornell v. Manor Care, Inc., No. CIV. A. 97-5883, 1999 WL 257663, at *4 (E.D. Pa. Apr. 29, 1999) (finding genuine dispute of material fact as to whether nurse assistant employee's alleged assault of patient was in furtherance of employment). In Barry, an employee nursing assistant allegedly assaulted a nursing patient while attempting to change the patient's diaper. 1999 WL 257663, at *4. Allowing the claim to survive summary judgment, the court considered various pieces of circumstantial evidence showing a genuine dispute of material fact regarding whether the employee nursing assistant actually did assault the patient. Id. at *3. This evidentiary dispute, in addition to the allegation that the assault occurred at the time the employee nursing assistant was changing the patient's diaper, created questions for the finder of fact regarding vicarious liability. Id. at *3-*4.

The instant case is easily distinguishable from Barry. The facts here do not show Good's conduct was actuated to serve Epic or Apex. Good was not serving Epic and Apex while babysitting and transporting K.J. and A.C. In fact, it is clear Good was serving both herself and K.C.J. when conducting these activities outside the scope of her employment. When Good transported K.C.J.'s children to her home in Delaware, Good did so with (1) K.C.J.'s explicit permission, (2) without Epic and/or Apex's permission, and (3) for personal reasons, such as cooking dinner for her own family. Doc. 61-2, 51:7-11; 54:13-20. When Good babysat K.C.J.'s children K.C.J. paid her cash for these services. Doc. 62, at ¶ 24. K.C.J. knew that her paid arrangement with Good to babysit K.J. and A.C. was "double-dipping" for Good. Id. at ¶ 25. Finally, Good considered K.C.J. her employer when she discussed Good's care of K.J. and A.C.. Doc. 61-2, 18:11-19. Contrary to Plaintiffs' arguments, it is highly relevant that Good believed K.C.J. was the employer during these actions. Good's employee relationship with K.C.J. is fundamental to our analysis and demonstrates Good's babysitting and transportation of K.J. and A.C. were actuated to serve K.C.J. and herself, not Epic and Apex. As such, Good's actions were outside the scope of her employment with Epic and Apex. Plaintiffs have not demonstrated a genuine issue of material fact that Epic and Apex are vicariously liable for the acts of Good during the sexual assault.

**B. Defendants Epic and Apex, as a matter of law, did not owe a duty of care to K.J. and A.C. for criminal actions of third parties.**

More broadly, Plaintiffs allege Epic and Apex "violated its/their duty(ies), and were negligent, careless, grossly negligent, and/or reckless . . ." Doc. 27, at ¶ 42. Plaintiffs' allegations extend beyond Epic and Apex's alleged failure to retain, hire, train, and supervise its agents and employees. Id. Epic and Apex argue that, as a matter of law, neither company owed a duty of care directly to A.C. and K.J. Doc. 62, at 15-18. Defendants argue that Plaintiffs seek to impose a

duty on home health service companies to protect non-clients. Id. Finally, Epic and Apex argue no such duty has been recognized under Pennsylvania law. Plaintiff cannot demonstrate that Defendants owed a duty to Plaintiffs and find no new duty applies to Epic and Apex in this case.

"The question of duty in tort is 'a legal determination, assigned in the first instance to the trial court.'" Scampone v. Highland Park Care Ctr., LLC, 57 A.3d 582, 600 (Pa. 2012) (quoting Sharpe v. St. Luke's Hosp., 821 A.2d 1215, 1219 (Pa. 2003)). It is settled Pennsylvania law that, "'[u]nder common law, as a general rule, there is no duty to control the conduct of a third party to protect another from harm." Ritz v. Ramsay, 305 A.3d 1056, 1061(Pa. Super. Ct. 2023) (quoting Emerich v. Phila. Ctr. for Hum. Dev., Inc., 720 A.2d 1032, 1036 (Pa. 1998)). Such duties are only recognized in limited circumstances where a special relationship exists. Id. (citing Emerich 720 A.2d at 1036). "These special relationships are 'a parent's duty to control a child; a master's duty to control a servant; a possessor of land's duty to control a licensee; and the duty of those in charge of individuals with dangerous propensities to control those individuals.'" Id. (quoting Brisbine v. Outside in School Experiential Educ., Inc., 799 A.2d 89, 93 (Pa. Super. Ct. 2002) (internal citations omitted)).

Despite the settled law against holding parties liable for the acts of third parties, the Pennsylvania Supreme Court has created a test to determine whether a new duty exists when evaluating negligence claims under Pennsylvania law. See Althaus ex rel. v. Cohen, 756 A.2d 1166, 1169 (Pa. 2000). This test weighs "several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor and (5) the overall public interest in the proposed solution." Althaus, 756 A.2d at 1169. "[N]o one of these five factors is dispositive. Rather, [a duty] will be found to exist where

the balance of these factors weighs in favor of placing such a burden on a defendant." Phillips v. Cricket Lighters, 841 A.2d 1000, 1008-09 (Pa. 2003). The Althaus factors are "'more relevant to the creation of new duties than to the vindication of existing ones[,]' and 'if a common law duty exists under the Restatement (Second) of Torts, the Althaus analysis is not necessary.'" Temple v. Providence Care Ctr., LLC, No. 87 WDA 2017, 2018 WL 3358598, at *14 (Pa. Super. Ct. Jul. 10, 2018) (quoting Scampone v. Grane Healthcare Co., 169 A.3d 600, 617 (Pa. Super. Ct. 2017)).

The Pennsylvania Supreme Court has cautioned that "[a]lthough [its] Althaus analysis applies principles well-rooted in the common law," the Court has "long recognized that determining whether to impose a duty of care in novel circumstances can provide difficult, requiring policy judgments generally reserved for legislative action." Walters v. UPMC Presbyterian Shadyside, 187 A.3d 214, 222-23 (Pa. 2018). As such, "'unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors predominating, we will not impose new affirmative duties.'" Id. at 240 (quoting Seebold v. Prison Health Servs., Inc., 57 A.3d 1232, 1245 (Pa. 2012)). Here, a balance of the Althaus factors weighs against imposing a new duty on home health service companies to protect client-family members (i.e. non-clients) from the actions of non-employee third parties.[14]

[14] This Althaus analysis is considered with significant caution. "[D]etermining whether to impose a duty often requires us to weigh 'amorphous public policy considerations, which may include our perception of history, morals, justice and society.'" Walters, 187 A.3d at 223 (Pa. 2018) (quoting Althaus, 756 A. 2d at 1169). Before conducting Althaus analysis, "the litigants must first present record-based advocacy and comprehensive discussion of the competing policy matters implicated by the imposition of a new affirmative duty." See Sellers v. Twp. of Abington, 106 A.3d 629, 690 (Pa. 2014) (Saylor, J., concurring). This has not occurred in the instant case. Nonetheless, the analysis is conducted here.

The first factor requires this Court to consider the relationship between the parties. Althaus, 756 A.2d at 1169. Where courts have found no discernable relationship between the plaintiff and the defendant, this factor weighs against the existence of a duty. See, e.g., Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, at 62 (3d Cir. 2009) (finding relationships factor weighed against a duty where a child was injured and relationship between the parties was uncertain). Good's care of K.J. and A.C. was not within the scope of her employment as a home health aide for Epic and Apex. Epic and Apex had neither a duty to control Good in her role as a babysitter for K.J. and A.C., nor did they have a special relationship with K.J. and A.C. Perhaps most importantly, Rosario, the individual who committed the sexual assault against A.C., was a third party without any semblance of connection to Epic and Apex. As such, the first Althaus factor weighs against imposing a duty of care upon Epic and Apex.

The second and third factors require this Court to weight the social utility of Epic and Apex's conduct against the potential risk and foreseeability of harm. Althaus, 756 A.2d at 1170. "The need for prevention of child abuse is unquestionable . . ." Id. Likewise, Epic and Apex's roles as providers of home health care services for individuals such as S.J. has significant social utility. Balancing the need to prevent child abuse but also to provide important health services, Epic and Apex conducted significant background checks for new employee hires. Doc. 62, at ¶¶ 6-8; Doc. 62-6, at APEX0008-0040. Epic and Apex's corporate policies and training prohibited babysitting non-patients and transporting patients or others to any location outside the patient's home. Doc. 61-3 at 30:16-31:5; 31:8-17; 45:4-14; Doc. 61-5, at 42:7-47:14. In light of the evidence presented by the parties, it is not reasonable to conclude that Good or Rosario's actions were reasonably foreseeable by Epic and Apex. See generally First Church of Christ, 748 A.2d at 700 (finding that co-defendant minister's sexual abuse of a minor outside of the minister's place

of employment and not as a spiritual advisor could not be anticipated by defendant church); see also Costa 708 A.2d at 494 (finding that defendant hospital was not vicariously liable for assault by employee against plaintiff as the assault was in not remotely related to the kind and nature of employment the hospital worker). Consequently, the second and third Althaus factors weigh against imposing a duty in the instant matter.

The fourth factor requires this Court to consider the consequences of burdening home health service companies with a duty of care beyond that owed to their patient(s). See Althaus, 756 A.2d at 1170. Imposing the duty of care for which Plaintiffs seek would be unduly burdensome. Such a duty would leave home health service companies liable for any and all instances of misconduct committed against their patients, no matter how removed the doer of misconduct is from the companies themselves. Such a decision is better left for the Pennsylvania legislature, which can determine whether the burdens such a duty would create outweigh the benefits home health service companies provide in the Commonwealth of Pennsylvania. See generally Nace v. Pennridge Sch. Dist., 744 F. App'x. 58, 65 (3d. Cir. 2018) (choosing not to engage in Althaus factor analysis because whether to impose a duty of care in novel circumstances is a policy judgment generally reserved for legislative action). Thus, the fourth Althaus factor weighs against imposing a duty in the instant matter.

The fifth and final Althaus factor requires this Court to consider the public interest in the proposed solution. Althaus, 756 A.2d at 1171. It is axiomatic that the public has a significant interest in eliminating any and all instances of child abuse. Requiring home health service companies, however, to prevent any and all instances of misconduct committed against non-patients *by third parties* is both impractical and contrary to the principles of established Pennsylvania law. See J.E.J. v. Tri-County Big Brothers/Big Sisters, Inc., 692 A.2d, 582, 584-85

(Pa. Super. Ct. 1997) (finding that the defendant, a private mentoring organization, was not liable for negligence claim based upon its failure to report mentor's suspected abuse when that mentor later abused a child who was not involved in the mentoring program as "the law simply does not allow liability to be stretched as far as [the plaintiffs] suggest."). Therefore, the fifth Althaus factor weighs against imposing a duty in the instant matter.

On balance, the Althaus factors weigh against imposing a duty on Epic and Apex to protect non-patient children from abuse by non-employee third parties. Epic and Apex did not owe a duty of care to K.J. and S.J. As a result, Epic and Apex cannot be held responsible for the actions committed by Rosario, a third party with no connection to either Defendant, against non-clients K.J. and S.J. Therefore, the Court rejects Plaintiffs' claims on these grounds.

## V. CONCLUSION

This Court finds that, as a matter of law, Defendants Epic and Apex are neither vicariously liable to Plaintiffs nor did they owe Plaintiffs K.J. and A.C. an independent duty of care for the criminal actions of third parties. Accordingly, summary judgment is hereby **GRANTED** in favor of Defendants Epic and Apex on all claims, and Plaintiffs' claims against Epic and Apex are dismissed with prejudice. Plaintiffs' claims against Defendant Good remain pending. An appropriate order will follow.